UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| AHKEEM SHAKUR SCOTT-MANNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-00087-JRO-MJD |
| | ) | |
| CLARKE et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Akheem Shakur Scott-Manna[1] alleges in this 42 U.S.C. § 1983 lawsuit that the defendants are violating his Eighth Amendment rights by continuing to house him in segregation despite his serious mental illness and that they have deprived him of adequate mental healthcare. Dkt. 182.[2] The Court's screening order allowed Scott-Manna to proceed with: (1) official capacity Eighth Amendment claims for declaratory and injunctive relief against IDOC Commissioner Lloyd Arnold, James Basinger, and Jack Hendrix (collectively the "IDOC Defendants") based on allegations that they have subjected Scott-Manna

[1] The Court recruited counsel for Scott-Manna, and he is represented by Melissa Macchia, Julia Powers, Reid Dickerson, and Claire Bailey from Taft Stettinius & Hollister LLP in Indianapolis, Indiana. The Court thanks counsel for their dedicated service.

[2] Scott-Manna also asserted an Eighth Amendment excessive force claim against John and Jane Doe defendants. *See* dkt. 181 at 5. The Court allowed Scott-Manna to proceed with the claim and conduct discovery to learn the identities of the defendants. As Defendants argue, Scott-Manna has not identified any defendants for this claim and has not briefed the issue in either of his responses to the defendants' motions for summary judgment. *See* dkt. 253 at 12. Therefore, this claim is **DISMISSED without prejudice** for failure to prosecute and the Court does not discuss it further in this order.

to unconstitutional conditions of confinement; (2) official capacity Eighth Amendment deprivation of medical care claims for declaratory and injunctive relief against Centurion Health of Indiana, LLC ("Centurion"), Dr. Mary Ruth Sims, Dr. Ellen Keris, and Sarah Clarke (collectively with Centurion the "Centurion Defendants"); and (3) individual capacity Eighth Amendment deliberate indifference to medical needs claims against Basinger, Hendrix, Dr. Sims, Dr. Keris, and Clarke. Dkt. 181. Both groups of defendants filed motions for summary judgment on all claims. For reasons explained below, the Court **GRANTS** the IDOC Defendants' motion on qualified immunity grounds, dkt. [251], and **GRANTS in part and DENIES in part** the Centurion Defendants' motion under the Eighth Amendment, dkt. [261]. Scott-Mana's individual capacity Eighth Amendment claim against Dr. Sims is the only claim that will proceed to trial.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014). A court only has to

consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

Because the defendants moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Scott-Manna and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

Plaintiff Scott-Manna is an inmate in the custody of the Indiana Department of Correction ("IDOC"). During the times relevant to this lawsuit, Scott-Manna was incarcerated in restrictive housing units at New Castle Correctional Facility ("New Castle"), Westville Correctional Facility ("Westville"), and Wabash Valley Correctional Facility ("Wabash Valley").

The IDOC Defendants are James Basinger, Jack Hendrix, and Lloyd Arnold. Hendrix was the IDOC's Executive Director of Classification until 2024. Dkt. 265-4 at 2. As the executive director, he reviewed and made recommendations for classification appeals, reviewed and revised policies, and collaborated with mental health providers. *Id.* at 2–3. Basinger was Deputy Commissioner of Operations for the IDOC from 2012 until around December 2024. Dkt. 252-3 at 7:15-22. As of 2024, Basinger serves as the Chief of Staff for the IDOC. *Id.* at 7:23–8:7. Arnold is the Commissioner of the IDOC.

The Centurion Defendants are Centurion, Dr. Ellen Keris, Dr. Mary Ruth Sims, and Mental Health Practitioner ("MHP") Sarah Clarke. Centurion has been the contracted medical provider for the IDOC since July 2021. Dkt. 261-1 ¶ 2. Dr. Keris is a clinical psychologist who served as the Statewide Director of Behavioral Health for Centurion from 2021 until May 2026. *Id.* Dr. Sims is a clinical psychologist who provides mental health services to inmates at Wabash Valley. Dkt. 261-2 ¶¶ 1–2. Dr. Sims does not have any policy-making authority at Centurion. *Id.* ¶ 4. MHP Clarke worked as a mental health practitioner providing mental health services to inmates at Wabash Valley from 2015 to 2025. Dkt. 261-3 ¶¶ 1–2.

## B. The IDOC and Centurion's Policies for Restrictive Housing and Mental Health

To place an inmate on restrictive housing status, such as Department Wide Administrative Restrictive Status Housing ("DWARSH" or segregated or restrictive housing), IDOC correctional facilities must make a request, which is

then reviewed by a classification analyst and ultimately approved by the IDOC regional director of adult facilities. Dkt. 252-1 ¶ 16. Once approved, the IDOC executive director of classification reviews the recommendation to place the inmate in the appropriate facility. *Id.* In some cases, the classification analyst requires a "Request for Mental Status Report for Offender Recommended for Placement in Restrictive Status Housing Unit," also known as State Form 53491, which is completed by a member of Centurion's mental health staff. *Id.* ¶ 19; Dkt. 252-4 at 187:12–22. The form includes boxes for medical staff to check, including whether the inmate will "decompensate" if placed in restrictive housing, whether the inmate has an "Axis I" diagnosis,[3] and whether he has been prescribed psychotropic medication in the last 90 days. Dkt. 252-1 ¶¶ 19–20. If any of the boxes are checked, the classification analyst will seek a recommendation from the behavioral health team before placing the inmate in restrictive housing. *Id.* ¶ 20.

In response to previous federal lawsuits, the IDOC developed a policy for placing "seriously mentally ill" ("SMI") inmates in restrictive housing. Dkt. 261-1 ¶ 4. SMI is a label developed by the federal court and it is not a mental health diagnosis. *Id.* The SMI "inclusion criteria" considers diagnoses of psychotic disorders and bipolar disorders as well as clinically severe mental illness, functional impairments, intellectual disabilities, "serious suicide attempts," and

[3] According to Dr. Keris's testimony, "Axis 1" is an outdated categorization of major mental health disorders, including psychotic or manic disorders such as schizophrenia and bipolar. *See* dkt. 252-4 at 129:25–130:4.

"serious self-injury" in the preceding six months. *See* dkt. 266-5; dkt. 261-8 at 221. If a mental healthcare provider determines that an inmate is SMI, he or she can only remain in restrictive housing for 30 days unless the IDOC determines that the "danger exception" applies. Dkt. 261-1 ¶ 4. If the "danger exception" applies, then mental health providers are required to provide more frequent treatment. *Id.*

Members of the classification division, such as Hendrix, do not override mental health codes, and they rely on mental health providers' judgment regarding the treatment of inmates. Dkt. 252-2 at 56:7–58:18, 71:20–25.

### C. Scott-Manna's Placement in DWARSH and Restrictive Housing

Scott-Manna was placed in restrictive housing soon after he entered the IDOC in 2014, and he has been in and out ever since. Dkt. 265-2 ¶¶ 1–2; *see* dkt. 252-6.

On July 26, 2023, the Assistant Facility Administrator at New Castle submitted a letter to IDOC's Central Office requesting that Scott-Manna be placed in DWARSH since he was not adjusting to incarceration at New Castle. Dkt. 252-6 at 6. Scott-Manna continued to violate rules, "particularly sexual conduct and sexual harassment toward staff" since being given another chance at New Castle's transition programming in March 2023. *Id.* The Assistant Facility Administrator noted that Scott-Manna was placed on mental health observation on May 18 and then moved to New Castle's restrictive housing unit "in lieu of a mental health bed due to other, higher-need individuals occupying those areas." *Id.* (as written). When asked about Scott-Manna's placement in a mental health

bed at New Castle, Hendrix stated that "from a layman's point of view, it appears that [placement in a mental health unit] would have been the first option if a bed had been available." Dkt. 265-6 at 5 (43:10–44:14).[4]

Dr. Keris completed the Request for Medical Status Report form for Scott-Manna's transfer to DWARSH. Dr. Keris marked that Scott-Manna did not exhibit current signs of an Axis I Diagnosis, was not at a high risk for decompensation, and had not been prescribed psychotropic drugs in the past 90 days. Dkt. 252-6 at 5. When completing the form, Dr. Keris reviewed Scott-Manna's chart and did a "quick scan of his history," looking for suicide watches, medications, and indicators that he was psychotic or manic. Dkt. 265-5 at 17–18 (128:7–130:4). As part of the materials for Scott-Manna's transfer to DWARSH, Hendrix reviewed the Assistant Facility Administrator's letter as well as the Request for Mental Status Report Form completed by Dr. Keris. *Id.* at 4 (39:13-23); dkt. 252-6 at 5.

Scott-Manna was transferred to Westville in August 2023, where he was placed in Department-Wide Disciplinary Segregation for assaulting staff resulting in serious bodily injury. Dkt. 252-9 at 4; Dkt. 252-7 at 5. On October 6, 2023, Scott-Manna was transferred to Wabash Valley's Special Confinement Unit ("SCU") to finish his disciplinary segregation sentence, which was set to end on September 20, 2024. Dkt. 252-9 at 4; Dkt. 252-7 at 5.

---

[4] To cite depositions that have four pages per one PDF page, the Court cites to the PDF page and the deposition page in parenthesis.

As of October 6, 2023, he was officially placed in DWARSH. Dkt. 252-9 at 4. Currently, Scott-Manna is serving a disciplinary segregation sentence, which will end in 2031. Dkt. 265-6 at 7–8 (64:23–65:2). He might be placed back in DWARSH after his disciplinary sanction ends. *Id.* at 8–9 (68:17–69:3).

Scott-Manna appealed his classification in DWARSH in November 2023 and his classification in disciplinary segregation in February 2024. Dkt. 252-8 at 1–2. Hendrix denied both appeals, citing Scott-Manna's overall negative adjustment and the fact that he received thirty-seven (37) conduct violations within the last year, including fleeing, battery against staff, and assaulting staff with bodily fluids and fecal waste. *Id.*

Scott-Manna received annual reviews of his classification in 2024 and 2025. Both reviews denied transfer and determined that he was appropriately placed in DWARSH due to his conduct history. Dkt. 252-13; Dkt. 252-14.

**D. Scott-Manna's Designation as SMI**

Scott-Manna's placement and treatment in restrictive housing depends on his designation as SMI. On November 28, 2014, Scott-Manna's IDOC intake document noted that Scott-Manna was recently diagnosed with major depressive disorder and was taking the anti-psychotic medication Geodon. Dkt. 266-4 at 2–3. On November 16, 2015, a non-Centurion provider determined that Scott-Manna presented with major depressive affective disorder and stated that "[h]e now meets the criteria for SMI and we will work with unit team to get him out of [restrictive housing]." Dkt. 266-1 at 3. The provider noted that Scott-Manna "cannot handle the [restrictive housing] situation any longer" and that he was

experiencing sleeping, eating, and mood problems. *Id.* While this provider found Scott-Manna met the SMI criteria, he was not in fact designated SMI in 2015. *Id.*

On October 24, 2016, however, a non-Centurion provider determined that Scott-Manna did not meet the SMI criteria. Dkt. 266-5 at 2–3. Even still, Scott-Manna continued to be prescribed anti-psychotic drugs. For example, on January 12, 2021, a non-Centurion provider noted that Scott-Manna reported visual and auditory hallucinations, paranoia, psychosis, and anxiety, and prescribed the anti-psychotic Haldol. Dkt. 266-6 at 2–3; Dkt. 265-3 at 5 (50:7–20). The Haldol was discontinued in 2022. Dkt. 261-7 at 32–33.

On January 19, 2023, mental health staff met with Scott-Manna to review his restrictive housing assignment and once again determined that he did not meet the SMI criteria, noting that he did not have active psychotropic medication orders and denied current suicidal ideation. Dkt. 261-8 at 202–03, 221–24.

On May 28, 2024, psychiatrist Dr. Bonner evaluated Scott-Manna and determined that he "[did] not have any features of a person with chronic psychosis." Dkt. 252-12 at 2. Dr. Bonner maintained that Scott-Manna had "Borderline P[ersonality] D[isorder]; [Anti-social Personality Disorder]; Provisional Malingering Psychosis[.]" *Id.* at 3. Dr. Bonner also noted that it appeared that Scott-Manna "only want[ed] help in achieving the goal of being moved from [Wabash Valley] and [restrictive housing] settings." *Id.* at 2. Scott-Manna's Behavior Modification Plan from June 24, 2024, noted that "[a]t no

point in time since 2011 in IDOC has [incarcerated individual] Scott-Manna ever been given a SMI diagnosis." Dkt. 266-2 at 2.

On February 25, 2025, a psychologist met with Scott-Manna after he set a fire in his cell. Dkt. 261-5 at 157–59. The psychologist determined that Scott-Manna did not meet criteria for SMI at that time and "there [were] no apparent mental health contraindications to continued placement in [restrictive housing]." *Id.* at 157.

In November 2025, a psychiatrist determined that Scott-Manna *did* have psychotic symptoms and thus, Scott-Manna was designated as SMI. Dkt. 252-4 at 144–148, 153.[5] The psychiatrist unofficially diagnosed Scott-Manna with a "rule out" "unspecified psychotic disorder" and prescribed Lurasidone (Latuda) for bipolar depression and psychosis. *Id.* at 144–145.

After the change in SMI designation, Wabash Valley's warden, Keith Vinardi, and mental health providers sought a danger exception to Scott-Manna's SMI status, citing the fact that Scott-Manna had received seventy-four (74) major conduct violations since arriving at Wabash Valley, including for assaulting staff and sexual conduct. Dkt. 252-16. The danger exception was approved by Dr. Neil Duchac, the IDOC's Executive Director for Behavioral Health, on December 3, 2025. *Id.* Therefore, Scott-Manna remained in restrictive housing despite the SMI designation.

[5] Scott-Manna cites internal emails discussing this diagnosis, but as stated in the Court's order on September 29, 2026, they do not appear on the docket. *See* dkt. 287 at 1 n.1. Therefore, the Court cites only to deposition testimony regarding the emails and the diagnosis.

On February 9, 2026, psychiatrist Dr. Pairitz met with Scott-Manna and noted that his diagnosis was "unclear." Dkt. 266-13.

### E. Scott-Manna's Mental Healthcare in DWARSH and Restrictive Housing

The parties do not dispute that Scott-Manna received brief behavioral health reviews on a weekly basis and individual therapy every month to every six weeks at Westville, New Castle, and Wabash Valley at all relevant times. *See* dkt. 265-4 ¶¶ 25–31. Instead, Scott-Manna contends that Defendants ignored known mental health risks that indicated that he is SMI and unfit for the SCU at Wabash Valley, and that the Behavioral Modification Plan worsens his condition, leading to escalating and potentially lethal self-harm. *See* dkt. 265 at 2–6. Therefore, this section focuses on facts related to those disputes.

#### 1. Scott-Manna's Treatment at Westville

At Westville, where Scott-Manna was incarcerated from 2021 until September 2022, Scott-Manna regularly met with mental health staff roughly once a week to assess his placement in restrictive housing. *See* dkt. 261-9 at 52–60. On July 21, 2021, Scott-Manna reported hearing voices, but the mental healthcare provider noted that he did not appear to be responding to these internal stimuli. *Id.* at 60. On August 29, 2021, Scott-Manna was put on suicide watch for two weeks after he swallowed a screw and had superficial cuts to his wrist. *Id.* at 59; dkt. 261-6 at 78–87). Other than those two events, Scott-Manna generally reported that he was not contemplating self-harm and that there was

nothing remarkable to report. During this time, Scott-Manna also received out-of-cell therapy roughly once a month. *See* dkt. 261-6 at 50–213.

On July 3, 2022, a psychiatrist stopped Scott-Manna's Haldol prescription because he had "not taken" it for the past two months. Dkt. 261-7 at 32–33.

**2. Scott-Manna's Treatment at New Castle**

Scott-Manna transferred to New Castle's restrictive housing unit in September 2022. He received a medical intake during which he reported hearing voices and seeing things. *Id.* at 2–24. On November 27, 2022, a psychiatric nurse practitioner declined to prescribe medication after noting that Scott-Manna did not exhibit evidence of depression, anxiety, or psychosis. Dkt. 261-6 at 170–75.

At New Castle, Scott-Manna continued to receive weekly behavioral assessments, dkt. 261-9 at 46–52 and monthly individual therapy, *see* dkt. 261-6 at 192–213. Scott-Manna was placed on suicide watch several times, and during these times mental health staff met with him daily to assess his risk. *See, e.g.,* dkt. 261-6 at 118–69, 176–86. Further, Scott-Manna requested healthcare for depression, hearing voices telling him to harm himself, suicidal ideation, and difficulties sleeping several times in March and April of 2023. Dkts. 266-8, 266-9, 266-10, 266-11.

After Scott-Manna transferred to New Castle, Dr. Keris began to occasionally treat him. Dkt. 261-1 ¶ 10. Dr. Keris testified that when Scott-Manna was at New Castle, he displayed problematic behaviors, such as masturbating in front of female staff, that made it difficult to provide mental

healthcare to him and made him unfit for placement in a mental health unit. *Id.* ¶¶ 12, 31. Scott-Manna's mental healthcare providers consistently opined that he exhibited behaviors consistent with borderline and antisocial personality disorders rather than psychosis or another mental health condition that prevented him from functioning in daily life. *Id.* ¶ 31. Based on her personal interactions and knowledge, Dr. Keris believed that Scott-Manna's suicidal gestures were rooted in a desire for secondary gain[6] and that his suicide risk was low. *Id.* ¶ 25. She based this belief on the fact that Scott-Manna rarely engaged in lethal self-harm and when he did, he took steps to mitigate the risk. For example, though he swallowed a razor blade, he wrapped it first so it could pass with no issue. *Id.* Also, though he frequently claimed to have swallowed objects, x-rays would sometimes reveal that he had not. *Id.* Last, Scott-Manna's claims of suicidal thoughts often aligned with conduct reports, bed moves, and other external issues that he disliked, suggesting they were not credible. *Id.*

Several times, Dr. Keris declined to place Scott-Manna on suicide watch or declined to remove him from his cell when he was already on suicide watch. This was based on Dr. Keris's experience with Scott-Manna and her belief that his goal was merely to leave restrictive housing. *See* dkt. 261-6 at 102–03 (December 27, 2022, Medical Record); dkt. 261-8 at 57 (May 30, 2023, Medical

[6] Dr. Keris defined secondary gain as "engaging in behavior that was designed to obtain a goal or gain. For example, it is very common in the prison setting for inmates to claim to be suicidal when in reality, what they really want is to be moved to a different area of the prison . . . . The secondary gain is to be moved for reasons that are unrelated to the reported suicidal thoughts." Dkt. 261-1 ¶ 25.

Record); dkt. 261-1 ¶¶ 14, 19, 21, 23. When Scott-Manna threatened to cut himself or swallow objects, Dr. Keris instructed custody staff to search his cell but not to remove him so as not to reinforce his behavior. Dkt. 261-1 ¶ 19; Dkt. 261-8 at 79; Dkt. 261-8 at 40. Dr. Keris also informed the medical provider of reports that Scott-Manna swallowed or inserted foreign bodies or confirmed that x-rays had been ordered. *See* dkt. 261-1 ¶¶ 21, 23.

Dr. Keris did order suicide watch and continued close monitoring for Scott-Manna several times. On April 18 and May 18, 2023, Dr. Keris ordered Scott-Manna placed on suicide watch after nurses reported that Scott-Manna complained of hearing voices, swallowing four razors, and having a plan for suicide. Dkt. 261-1 ¶¶ 17–18. On May 27, 2023, Dr. Keris also ordered that Scott-Manna continue suicide watch after a nurse reported that he cut himself and that he threatened to bang his head in his cell. Dkt. 261-1 ¶ 20; Dkt. 261-8 at 68–69. Dr. Keris visited Scott-Manna on May 30 for his daily suicide monitoring and noted that his wounds were barely visible. Dkt. 261-1 ¶ 21; Dkt. 261-8 at 59–60. Scott-Manna told Dr. Keris that he heard voices telling him to do things, but she noted that he did not appear to hear voices, his presence was liner and organized, with no indication of auditory hallucinations, and he had never appeared to respond to hallucinations in the past. Dkt. 261-8 at 59–60. Overall, he did not appear to have any of the traditional symptoms of psychosis. *Id.*

### 3. Plaintiff's Treatment at Westville

On August 16, 2023, Scott-Manna briefly transferred back to a restrictive housing unit at Westville, where he continued to receive weekly behavioral assessments and monthly individual therapy. *See* dkt. 261-9 at 46.

### 4. Plaintiff's Treatment at Wabash Valley

Scott-Manna transferred to the SCU at Wabash Valley on October 6, 2023. Dkt. 252-9. After Scott-Manna transferred to Wabash Valley, Dr. Keris no longer had direct involvement in his treatment, although she might have discussed him during Centurion statewide staff discussions with on-site providers. Dkt. 261-1 ¶ 10.

At Wabash Valley, Scott-Manna continued to receive weekly behavioral assessments and individual therapy roughly every month. *See generally* dkt. 261-7; dkt. 261-9 at 29–46. Scott-Manna was placed on suicide watch several times in late 2023 and early 2024 following reports that he had swallowed or inserted objects into his orifices. *See id.* Furthermore, from April to June of 2024, Scott-Manna was transported to outside hospitals several times after he inserted staples and other items into his penis and swallowed razor blades. Dkt. 266-12; Dkt. 261-4 at 98–110.

#### i. MHP Clarke's Initial Treatment of Scott-Manna

On October 11, 2023, MHP Clarke met with Scott-Manna for suicide monitoring. Dkt. 261-7 at 95–103. She noted that Scott-Manna did not appear in distress and that his reports of hearing voices were "unconvincing." *Id.* at 95.

MHP Clarke placed Scott-Manna on safety precautions through the next day and then again on October 23. Dkt. 261-5 at 73–75.

On March 6, 2024, MHP Clarke met with Scott-Manna for an out-of-cell therapy session. Dkt. 261-3 ¶ 13. She noted that he had superficial self-harm marks on his forearm with no active bleeding and that nursing staff determined that he did not need wound care. *Id.* After Scott-Manna told Clarke he only cut himself to get out of the cell to speak to a mental health provider, she did not provide a mental health session so as not to reinforce his behavior. *Id.* Therefore, MHP Clarke responded to Scott-Manna's request for healthcare later that day that he would not be seen until his next appointment on April 6. *Id.*; Dkt. 261-5 at 9.

On May 6, 2024, MHP Clarke discussed a draft of Scott-Manna's behavior plan with her supervisors, including Dr. Sims. Dkt. 261-3 ¶¶ 14–15. Her intent with creating the plan was for Scott-Manna to identify goals and incentives and to identify potential replacement behaviors and coping skills to replace the negative behaviors. *Id.*

MHP Clarke placed Scott-Manna on safety precautions several times in May and June 2024. Dkt. 261-5 at 51–62; Dkt. 261-4 at 157–64. After removing Scott-Manna from suicide watch on June 5, 2024, MHP Clarke reviewed Scott-Manna's recent behavior and discussed him in a mental health treatment team meeting, where it was decided that current interventions were not working. Dkt.

261-4 at 113. They decided to remove him from suicide watch and to discuss a change in his care plan at a larger meeting. *Id.*

**ii. Dr. Sims's Initial Treatment of Scott-Manna**

On November 9, 2023, Dr. Sims conducted a suicide risk assessment after Scott-Manna was placed on close observation for making superficial cuts to his calf and reporting that he swallowed a razor blade. Dkt. 261-2 ¶ 9. After Scott-Manna refused to talk to her, and Dr. Sims consulted with officers, she removed Scott-Manna from suicide watch and placed him back in his cell. *Id.* Dr. Sims noted that Scott-Manna did not exhibit signs of psychosis despite his frequent claims of auditory hallucinations and that he had an extensive history of using suicide watch to control his housing placement. *Id.* Further, Dr. Sims determined that Scott-Manna's overall suicide risk was low because whenever he was placed on suicide watch, his self-harm and suicidal gestures would stop. *Id.*

On May 22, 2024, Dr. Sims discussed Scott-Manna's behavior plan with his other mental health providers over email. *Id.* ¶ 10. The team decided that Scott-Manna should see a male therapist due to his inappropriate sexual behavior in front of female staff. *Id.* They determined that medications were not warranted. *Id.*

**iii. The Formal Behavior Modification Plan and the Practice of "Benign Neglect"**

Mental health staff at Wabash Valley, including MHP Clarke and Dr. Sims, developed a behavior modification plan for Scott-Manna, which instructed using "benign neglect," which is a policy of ignoring Scott-Manna's negative behaviors,

such as self-harm, and assuming that he is seeking secondary gain and attention while ensuring that he was physically safe. Dkt. 266-2 at 4; Dkt. 265-7 at 100:3–17; Dkt. 261-3 ¶¶ 10, 16. On May 6, 2024, MHP Clarke discussed her draft of Scott-Manna's Behavior Modification Plan ("the Plan") with Dr. Sims over email. *Id.* ¶ 15. At some point, Dr. Sims, her supervisor, reviewed and approved it. Dkt. 265-7 at 99:21–100:2; 116:5–23. On June 24, 2024, Dr. Sims made an addendum to Scott-Manna's Plan, outlining Scott-Manna's recent self-harming behaviors of inserting metal objects in his orifices, leading to hospitalization. Dkt. 261-2 ¶ 11; dkt. 266-2.

On July 1, 2024, MHP Clarke and Dr. Sims participated in a multidisciplinary meeting to discuss to the Plan and the efforts to address Scott-Manna's problematic behaviors. Dkt. 261-3 ¶ 16; Dkt. 261-4 at 84–86. The meeting discussed reinforcing positive behaviors and how to target negative behaviors, such as assaulting officers, self-harm, and smearing feces. Dkt. 261-3 ¶ 16. Dr. Keris as well as non-defendants Dr. Dwenger and Dr. Verdon approved the Plan at some point. Dkt. 265-7 at 116:5–19. Scott-Manna received a copy of the Plan on July 23, 2024, on which he wrote obscenities and that the Plan consisted of lies. Dkt. 261-3 ¶ 17; Dkt. 261-4 at 169–75.

The Plan documented that mental health and custodial staff previously responded to Scott-Manna using "benign neglect.". Dkt. 266-2 at 4; Dkt. 265-7 at 100:3–17. But, in response to benign neglect, Scott-Manna shifted from "superficial cutting to inserting metal objects into orifices that can only be

removed in a hospital setting." Dkt. 266-2 at 3. Scott-Manna likely obtained self-harming items during trips to the hospital and when he was allowed on the range. *Id.* at 2.

In response to Scott-Manna's new self-harming behaviors, the Plan laid out several interventions. First, when Scott-Manna engaged in "non-life-threatening self-harm that may or may not produce blood," custody staff should notify the nurses to observe and "make any necessary treatments to the wound." *Id.* at 4. Mental health will then communicate with nursing to determine whether contact with mental health staff is necessary. *Id.* "[Mental health] will maintain that superficial self-harm behaviors will not result in suicide watch due to known motivation for secondary gain." *Id.* Scott-Manna should be returned to his cell immediately after nursing releases him and custody should search the cell to remove unauthorized items and things that could impair surveillance. *Id.* Second, when Scott-Manna's non-life-threatening self-harm requires outside treatment, "[mental health] will automatically place [incarcerated individual] Scott-Manna on a modified safety precautions/temporary mental health placement," which would replace suicide watch "for benign neglect." *Id.* This protocol includes enhanced monitoring and removal of dangerous items from his cell. *Id.* Third, "[b]ehavior that is self-harm and is life threatening will be treated on a case by case basis." *Id.* For Scott-Manna to be released from modified safety precautions, he would have to "work with [mental health] to complete a Dialectical Behavioral Therapy Self-Consultation worksheet." *Id.* Last, the Plan

lays out a schedule of reinforcements based on days free of target behavior. *Id.* at 5–6. These reinforcements include items such as "tablet" and "radio" as well as interactions with caseworkers and mental health sessions without MHP Clarke. *Id.*

**iv. Scott-Manna's Mental Health Treatment After the Plan**

After the implementation of the Plan, Scott-Manna was placed on suicide watch after he superficially lacerated himself on July 30, 2024. *See* dkt. 261-4 at 54–55, 185. A nonparty psychologist noted that suicide watch was not indicated since Scott-Manna's actions were not life threatening. *Id.* at 54. About a week later, MHP Clarke reviewed one of Scott-Manna's requests for healthcare where he made remarks about suicide. Dkt. 261-3 ¶ 18. Following the Plan, she decided not to treat the request urgently since Scott-Manna was seen by a psychologist recently and he was noted to be within normal limits during both encounters. *Id.*

For the remainder of 2024, Scott-Manna continued to be seen for behavioral health segregation visits, and he met with psychologists roughly once a month. *See* dkt. 261-4 at 49–53, 45–47,[7] 15–18, 6–10. When Scott-Manna threatened self-harm, mental healthcare workers notified custody staff and the MHP. *See id.* at 48. On December 10, 2024, mental health staff performed a suicide risk assessment, but ultimately determined that Scott-Manna's risk of

[7] Scott-Manna's September 6, 2024, appointment was not completed because the psychologist noted that he exposed his penis and sexually harassed the mental health clerk. Dkt. 261-4 at 45. Per the Plan the session was cancelled and his behaviors would be discussed at the next multidisciplinary meeting. *Id.*

suicide was low and that "acts of self-harm were superficial and non-life threatening." Dkt. 261-5 at 96–102. In 2025, Scott-Manna continued to be seen for individual therapy about once a month and received weekly behavioral health visits. Dkt. 261-5 at 136–40, 123–27, 157–59, 154–56.

Dr. Sims discussed Scott-Manna's mental healthcare with staff on several occasions. On January 11, 2025, a nurse called Dr. Sims and reported that Scott-Manna stated he was going to hang himself, and that he had superficial cuts to his left forearm. Dkt. 261-2 ¶ 15. Following the Plan, Dr. Sims declined to place Scott-Manna on suicide watch unless he caused serious harm to himself. *Id.* On April 10, 2025, Dr. Sims participated in a multidisciplinary meeting with staff to review Scott-Manna's current Behavior Modification Plan. *Id.* ¶ 17; Dkt. 261-6 at 24–26. The team reported that Scott-Manna's sexual conduct had decreased but that he continued to assault staff. Dkt. 261-2 ¶ 17. The team determined that mental health staff would continue to monitor Scott-Manna per the routine mental health protocol and his suicide risk assessment would continue to be used as needed. *Id.* The team also decided to continue the Plan to address assaultive behavior, and that, moving forward, the IDOC's behavior management template and process would be utilized with continued mental health staff guidance and support. *Id.*

On July 2, 2025, Dr. Sims had an out-of-cell visit with Scott-Manna. *Id.* ¶ 20; dkt. 261-8 at 251–55. After noting that Scott-Manna's incident reports had decreased, Dr. Sims set up the structure of therapy with him and told him that

he would be seen monthly; Scott-Manna seemed agreeable and happy with how the session went. *Id.* Dr. Sims updated his treatment plan, noting that Scott-Manna was motivated to reduce inappropriate behaviors and that he would be seen monthly to work on this. *Id.* Later that month, Dr. Sims met with Scott-Manna again, and he reported PTSD symptoms including hallucinations related to past traumatic experiences. *Id.* ¶ 21. Dr. Sims encouraged him to practice doing what good he wanted to do under difficult conditions. *Id.* She noted that his PTSD symptoms and his work on them would be monitored. *Id.* Dr. Sims met with Scott-Manna in August 2025, and she noted improvement in his behavior. *Id.* ¶ 22.

In September 2025, Scott-Manna sent a healthcare request form stating that he wanted to cut himself. *Id.* After discussing next steps with the treatment team, Dr. Sims decided that custody staff would monitor him so that the safety concerns were addressed without reinforcing Scott-Manna's threats to get attention. *Id.* Dr. Sims believed that giving Scott-Manna attention may increase the ideation and the actions themselves. *Id.*

In November of 2025, a psychiatrist met with Scott-Manna and entered a "rule-out" diagnosis for an unspecified psychotic disorder and prescribed Latuda. Dkt. 252-4 at 144:4–148:18, 153:2-4; dkt. 266-13. In February 2026, a psychiatrist reported that Scott-Manna reported auditory and visual hallucinations, but that his diagnosis was "unclear." Dkt. 266-13 at 3. Scott-Manna did not appear to respond to internal stimuli, and his descriptions of

visual hallucinations were atypical. *Id.* At that point, he did not report thinking about suicide. *Id.* at 4. The psychiatrist increased the Latuda dose "to target mood, subjective psychosis, and impulsivity." *Id.*

**F. Expert Witness Testimony Regarding Plaintiff's Treatment**

**1. Plaintiff's Expert, Dr. Torry**

Scott-Manna's retained expert witness, Dr. Zachary D. Torry, evaluated Scott-Manna and his medical records. Dkt. 270-1 at 2.[8] He concluded that Scott-Manna has a "complex diagnostic formulation," stemming from prolonged physical and sexual abuse which produced long-standing "depressive features, a pervasive negative and fragmented sense of self, recurrent self-injurious behaviors and suicidality, and trauma-associated auditory hallucinations." *Id.* at 59. Dr. Torry opined that Scott-Manna's diagnosis of borderline personality disorder is a serious mental illness, under the IDOC, and that psychotic symptoms are a well-recognized part of this condition. *Id.* at 63. When present, psychotic symptoms such as auditory and visual hallucinations should be considered legitimate in borderline patients as they are a marker of severity. *Id.* Those with borderline personality disorder and psychotic symptoms are at a greater risk of negative outcomes, including suicide. *Id.* Indeed, Dr. Torry opined that Scott-Manna's hospitalizations in 2024 for swallowing razor blades and inserting objects into his penis are examples of "high-lethality self-harm" and

---

[8] Dr. Torry's review does not include treatment provided by MHP Clarke or Dr. Keris. Dkt. 261-12 at 35–37 (32:14–33:13).

that this self-harming behavior "unequivocally indicates serious mental illness." *Id.* at 65, 69.

Dr. Torry opined that Scott-Manna's illness has been exacerbated by years in restrictive housing, which has turned his psychotic symptoms into "a comorbid primary psychotic disorder." *Id.* at 64. Restrictive housing is associated with "significant psychological harm, including new-onset psychiatric symptoms, exacerbation of pre-existing disorders, and elevated risk of self-harm, suicide, and post-release mortality." *Id.* Thus, Scott-Manna's prolonged placement in restrictive housing without commensurate mental health interventions "is clinically contraindicated and foreseeably exacerbates his condition." *Id.* at 72. Scott-Manna "should be managed in a mental health unit rather than in restrictive housing or routine segregation." *Id.* at 64.

Dr. Torry believes that the Plan approved by Centurion psychologists, including Dr. Sims, "is inconsistent with [Dialectical Behavioral Therapy] principles and markedly below accepted correctional mental health standards for someone at chronic, high-lethality risk of self-harm." *Id.* at 70. Namely, the Plan encourages "inconsistent, discretionary responses to potentially lethal acts" in a way that is "inconsistent with minimally adequate mental healthcare." *Id.* at 71. In contrast, accepted treatment for someone with Scott-Manna's symptoms requires "close monitoring, validation, active safety planning, structural interventions, and consistent behavioral contingencies." *Id.* The Plan reflects a pervasive stigma toward personality disorders, which has led providers to

minimize Scott-Manna's suffering, label his behavior as manipulative or malingering, and withhold care. *Id.* at 71. Thus, despite repeated documentation of Scott-Manna's severe self-harming behavior and psychotic symptoms, staff did not provide a coherent diagnosis or an evidence-based treatment plan, nor did they make a meaningful attempt to address his self-harm. *Id.*

In terms of mental health treatment, Dr. Torry stated that Scott-Manna's medical records show a "knowing failure to respond adequately to his serious mental condition." *Id.* at 71. Specifically, the medical providers, including Dr. Sims, "were aware of a substantial ongoing risk of self-harm and psychological deterioration, yet did not take reasonable steps within a minimally competent psychiatric practice to mitigate the risk," which does not meet the basic standards for evaluating and treating serious mental illness in a correctional setting. *Id.* at 71–72. Scott-Manna's mental healthcare providers overattributed manipulation and secondary gain to explain Scott-Manna's behavior. *Id.* at 69. This aligns with the literature on the stigma faced by people with borderline personality disorder. *Id.* All in all, Scott-Manna's mental health treatment "has been inconsistent with standards of care for minimally adequate mental health care for incarcerated persons with serious mental illness." *Id.* at 73.

**2. Centurion Defendants' Expert, Dr. Roof**

The Centurion Defendants' retained expert witness, Dr. Jason Roof, opined that Scott-Manna's health records show behaviors consistent with personality disorders with predominant antisocial and borderline personality traits. Dkt.

261-11 at 4. The records do not support a diagnosis of a serious mental illness, such as schizophrenia or a primary psychotic disorder because Scott-Manna is frequently described as having clear coherent speech, an organized thought process, and as not responding to internal stimuli. *Id.* at 5. There is no sustained documentation of delusions, disorganized thoughts, or the functional decline that is typically associated with schizophrenia. *Id.* at 6. Further, use of antipsychotic medication did not meaningfully change his symptoms or his behavior. *Id.* Scott-Manna also did not exhibit symptoms of a primary mood disorder, such as bipolar, because there was no evidence of a discrete episode of mania. *Id.*

Dr. Roof opined that Dr. Keris, Dr. Sims, MHP Clarke, and other mental healthcare staff met the appropriate standard of care for Scott-Manna's medication management, suicide risk and self-harm management, and in psychotherapy and behavioral interventions. *Id.* at 6–7. Additionally, the Plan approved by Dr. Sims is consistent with evidence-based contingency management strategies for personality pathologies in that it links privileges to sustained periods without self-harm threats or assaults. *Id.* at 7. All in all, the medical records demonstrate efforts to balance the safety risks posed by Scott-Manna's behavior towards staff with his mental health needs. *Id.*

### G. Plaintiff's Conditions of Confinement in the SCU at Wabash Valley

Scott-Manna lives in near total isolation in the SCU at Wabash Valley. Dkt. 265-2 ¶¶ 4–5. His tiny cell has a concrete bed and a solid metal door where the only way to see outside the cell is through the cuff port and a small door window,

overlooking the range. *Id.* ¶¶ 11–12. The lack of natural light makes Scott-Manna feel trapped and worsens his mental state by disrupting his circadian rhythm. *Id.* ¶¶ 14–15; *see* dkt. 265-5 at 10 (53:8–54:5). Scott-Manna endures constant noise from inmates yelling and engaging in self-harm. *Id.* ¶¶ 17–21. Since Spring 2025, he has only been able to leave his cell one to two times a week for an hour of exercise, which makes him feel trapped and unstable. *Id.* ¶¶ 22–24.

Previous lawsuits against the IDOC have brought conditions of confinement in Wabash Valley's SCU to light. Dr. Keris testified that the *Mast* lawsuit addressed access to natural light for inmates who are seriously mentally ill. Dkt. 265-5 at 52:9–25; *see Mast v. Donahue*, 2019 WL 3306204, *1–2 (S.D. Ind. July 23, 2019) (discussing the Mast Agreement and a private settlement agreement between the Indiana Protection and Advocacy Services Commission and the Indiana Department of Correction, both of which restricted placing seriously mentally ill inmates in restrictive housing).

## III. DISCUSSION OF THE IDOC DEFENDANTS

### A. Basinger and Hendrix are Entitled to Qualified Immunity on Scott-Manna's Eighth Amendment Deliberate Indifference to Medical Needs Claim

The Eighth Amendment's prohibition against cruel and unusual punishment requires states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[T]o prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is

subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Basinger and Hendrix argue that Scott-Manna has not provided evidence that they were deliberately indifferent to his mental health when they processed his placement in DWARSH in 2023 and they are entitled to qualified immunity. Dkt. 253. Because the Court agrees with the IDOC Defendants on qualified immunity, it does not discuss the merits.

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although qualified immunity is an affirmative defense, plaintiffs have the burden of defeating it once defendants raise it. *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017). Thus, to overcome the defense, Scott-Manna must show that: (1) Basinger and Hendrix violated his statutory or constitutional rights; and (2) the right was clearly established at the time of the challenged conduct. *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025). Courts may exercise their discretion to choose which element to address first. *Id.* (citing *Pearson v.*

*Callahan*, 555 U.S. 223, 236 (2009)). The Court begins and ends its analysis with the second element because it is dispositive.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). "Existing precedent must place the constitutional or statutory question beyond debate" so that "every reasonable official would understand that what he is doing is unlawful." *Sabo*, 128 F.4th at 844 (citations omitted). Clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The right has been defined "too generally if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that [the rule] was firmly established." *Sabo*, 128 F.4th at 844.

To meet his burden, Scott-Manna must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The failure to do so means that Scott-Manna "cannot defeat" a "qualified immunity defense." *Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (reversing summary judgment denial on qualified immunity grounds because plaintiff did not identify

a sufficiently analogous case or explain why defendant's actions were plainly excessive).

Scott-Manna cites *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676 (7th Cir. 2012), for the proposition that prison officials have an obligation to provide psychiatric care to inmates pursuant to their constitutional obligation to address their serious medical needs. Dkt. 265 at 29. That case involved the death of a schizophrenic man from suffering from psychogenic polydipsia while he was incarcerated in Elkhart County Jail. *Rice*, 675 F.3d at 676. No reasonable officer could read *Rice* and deduce that processing and approving a mentally ill person's transfer to DWARSH violates the Eighth Amendment. *See Zorn v. Linton*, 607 U.S. 568, 572 (2026) ("[O]fficers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." (quoting *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015))). For one, *Rice* affirmed the district court's determination that the jail did not have a policy or custom of depriving inmates of psychiatric care. 675 F.3d at 675. Even though the sheriff did not exercise his authority to transfer the decedent to a psychiatric facility, "jail officials ordinarily are entitled to defer to the judgment of medical professionals" and the court determined that there was no evidence that any officer should have second-guessed the judgment of the jail's medical providers. *Id.* These circumstances would actually support Hendrix and Basinger's decision to defer to Dr. Keris's representation that Scott-Manna would not decompensate in DWARSH, was not being prescribed

psychotropic medications, and did not have an Axis I diagnosis. Last, the circumstances in *Rice* cited by Scott-Manna involved the jail's municipal liability for its policies and training. But Scott-Manna's Eighth Amendment medical claims against Hendrix and Basinger involve their personal liability for denying mental healthcare. The cases are incomparable.

Scott-Manna also cites *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008), as clearly establishing that officials may not ignore a known substantial risk of serious harm or avoid liability by refusing to verify facts they strongly suspect to be true. Dkt. 265 at 29. *Townsend*, however, involved a dispute of fact over a correctional officer's knowledge that the plaintiff was sleeping on a wet and moldy mattress. None of the circumstances in *Townsend* would have put a reasonable officer on notice that approving the transfer of a mentally ill inmate to DWARSH would violate the Eighth Amendment.

Neither *Rice* nor *Townsend* provide reasonably analogous precedent that would put a reasonable officer on notice that Hendrix and Basinger's conduct in this case would violate the Constitution. Furthermore, *Rice* shows that Hendrix's decision to rely on Dr. Keris's representation of Scott-Manna's mental health was not "so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *See Leiser*, 933 F.3d at 701. Therefore, the Court grants summary judgment to Basinger and Hendrix because they are entitled to qualified immunity.

**B. Eighth Amendment Conditions of Confinement Claims for Injunctive and Declaratory Relief**

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted).

Scott-Manna argues that the SCU's design and the "benign neglect" policy in his Behavior Modification Plan subject him to extreme isolation, lack of access to natural light, non-stop noise, and lack of exercise. Dkt. 265 at 19–25. Therefore, he seeks a permanent injunction moving Scott-Manna to a treatment-focused mental health unit and a declaration that the IDOC's treatment of Scott-Manna violates the Eighth Amendment. *Id.* at 25–27. The IDOC Defendants argue that Scott-Manna's conditions-of-confinement claims fail on the merits and weigh against the public interest due to his extensive conduct history. Dkt.

253 at 15–16. They further argue that declaratory relief is not warranted because there is no need to clarify or settle legal relations or afford relief from uncertainty. *Id.* at 14.

**1. Injunctive Relief**

"Permanent injunctive relief is appropriate when a plaintiff has shown: (1) success . . . on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 867 (7th Cir. 2018) (citations omitted).

In this case, injunctive relief is not warranted because Scott-Manna's Eighth Amendment conditions-of-confinement claim fails. Namely, Scott-Manna has not provided evidence that the IDOC Defendants possess a sufficiently culpable state of mind.

Scott-Manna designates evidence showing Hendrix's culpability by pointing to his testimony that the July 2023 request to place Scott-Manna in restrictive housing "in lieu of a mental health bed" suggests that the mental health bed was the first option, but he signed off on the transfer after merely reviewing Dr. Keris's form. Dkt. 265 at 24. For one, Scott-Manna mischaracterizes Hendrix's testimony. Hendrix testified that "from a layman's point of view, it appears that [placement in a mental health unit] would have been the first option if a bed had been available." Dkt. 265-6 at 5 (43:10–44:14). His testimony is not that he personally understood Scott-Manna to require a

mental health bed over placement in restrictive housing. Second, there is no evidence in the record that Hendrix (or Basinger) had reason to doubt Dr. Keris's representation that Scott-Manna was not SMI and would not decompensate in restrictive housing. As seen above, "non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles*, 914 F.3d at 1049. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations omitted). There is no evidence in the record that Hendrix or any other IDOC official knew or should have known that Dr. Keris's representation that Scott-Manna was not SMI and would not decompensate was false. Therefore, there is no evidence that Hendrix or any other IDOC official knowingly subjected Scott-Manna to the conditions in the SCU if they knew it would harm him in 2023.

Additionally, when assessing the need for injunctive relief, the Court looks to the defendants' current conduct and current state of mind. *Farmer*, 511 U.S. at 845 (explaining that in ruling on a plaintiff's request for a permanent injunction, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct[.]"). Scott-Manna notes that the IDOC approved the danger exception after he was designated as SMI in November 2025, *see* dkt. 265 at 35, but he has not designated evidence

showing that any IDOC Defendant knowingly misapplied the exception to keep Scott-Manna in the SCU or knowingly withheld the required treatment for SMIs in restrictive housing. Furthermore, there is no designated evidence that any IDOC official has current knowledge of Scott-Manna's experiences or complaints about the lack of exercise, windows, and human contact. In sum, Scott-Manna has not met his burden of showing that the IDOC Defendants are currently violating his Eighth Amendment rights. The Court grants summary judgment to the IDOC Defendants on the injunctive relief claim.

#### 2. Declaratory Relief

Because the Court has determined that Scott-Manna's conditions-of-confinement claims fail on the merits, declaratory relief is not warranted.

## IV. DISCUSSION OF THE CENTURION DEFENDANTS

### A. Eighth Amendment Deliberate Indifference to Medical Needs Claims Against Dr. Sims, Dr. Keris, and MHP Clarke

Although the parties disagree about Scott-Manna's mental health diagnoses and whether he is SMI, they do not contest that his mental health issues constitute a serious medical condition for Eighth Amendment purposes. Thus, the Court's focus is on the second element, deliberate indifference. To avoid summary judgment, the record must allow a reasonable jury to conclude that Dr. Sims, Dr. Keris, and MHP Clarke "consciously disregarded a serious risk to [Scott-Manna]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021). Because medical professionals rarely admit that they consciously disregarded a prisoner's serious medical condition, "deliberate

indifference must be inferred from the propriety of their actions." *Id.* (citation omitted). Deliberate indifference can be inferred when the defendant renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such judgment.'" *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)). Deliberate indifference can also be inferred when a defendant persists "in a course of treatment known to be ineffective," or chooses "an easier and less efficacious treatment without exercising professional judgment[.]" *Id.* at 729–30 (citations omitted).

Scott-Manna argues that the Behavior Modification Plan departs substantially from accepted professional judgment and evinces the individual Centurion Defendants' conscious decision to persist in a course of treatment known to be ineffective. Dkt. 269 at 14–18. Furthermore, he says, Dr. Keris displayed deliberate indifference when she performed a cursory evaluation of Scott-Manna and approved Scott-Manna's placement in DWARSH in July 2023 despite indications that Scott-Manna has a serious mental illness that is worsened by his confinement in the SCU. *Id.* at 19. The Court discusses each individual defendant below. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)) ("'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'").

**1. Dr. Sims**

There is no dispute that Dr. Sims helped to create, approved, implemented, and made an addendum to the Plan and was Scott-Manna's provider at the time it was approved and implemented. Dkt. 252-11 at 1, 5; Dkt. 261-2 ¶¶ 10–15; Dkt. 266-2; Dkt. 261-3 ¶ 16; Dkt. 265-7 at 99:21–100:2; 116:5–23. But there is a dispute of fact as to whether the Plan, which Dr. Sims approved and implemented, departed so substantially from minimally competent standards of carceral mental healthcare as to reflect that she did not exercise professional judgment at all. *See Petties*, 836 F.3d at 729. In contrast to Centurion's expert witness Dr. Roof, Scott-Manna's expert witness Dr. Torry opined that the Plan and Scott-Manna's treatment under the Plan departs substantially from the minimally adequate standard of care for inmates with Scott-Manna's condition. *See* Dkt. 270-1 at 70–73; dkt. 261-11 at 4.

As Centurion points out in their reply, a disagreement among experts over the defendants' adherence to the accepted standard of care is not necessarily material in an Eighth Amendment case. *See Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016) ("By itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk."). In this case, however, Dr. Torry's opinion—which is supported by the record—does not merely opine that Dr. Sims's treatment decisions were unreasonable or wrong. Dr. Torry opined that Dr. Sims's treatment and the Plan are "inconsistent with standards of care for *minimally adequate* mental health care for

incarcerated persons with serious mental illness." Dkt. 270-1 at 73 (emphasis added). Dr. Torry bases this opinion on evidence from the record that Scott-Manna's healthcare providers, including Dr. Sims, held a bias against personality disorders, which led providers to minimize Scott-Manna's suffering and label his self-harming behavior as malingering and manipulative. *Id.* at 71. In turn, Dr. Sims and other providers did not coherently diagnose Scott-Manna or provide an evidence-based treatment plan. *Id.* As such, the Plan encourages "inconsistent, discretionary responses to potentially lethal acts" when accepted treatment for someone with Scott-Manna's condition requires "close monitoring, validation, active safety planning, structural interventions, and consistent behavioral contingencies." *Id.*

From this assessment, a reasonable jury could find that Dr. Sims actions fell below minimal competency by basing her treatment decisions and the Plan on bias and an incoherent diagnostic criteria as opposed to professional judgment and evidence-based practices. Thus, a reasonable jury could infer that Dr. Sims, as Scott-Manna's provider, was not merely negligent but deliberately indifferent to Scott-Manna's condition. *See McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024) (citations omitted) (courts must generally defer to medical professionals "in treatment decisions unless no minimally competent professional would have responded so under those circumstances.").

Accordingly, the dispute of fact between the expert opinions is material in this case, and a jury must decide whether Dr. Sims's treatment and the Plan fell

so far below the acceptable standard of care as to constitute deliberate indifference. The Court denies summary judgment for Dr. Sims on the individual capacity Eighth Amendment claim.

**2. MHP Clarke**

Although MHP Clarke had a hand in creating the Behavior Modification Plan and treated Scott-Manna at Wabash Valley from 2023 until 2025, a reasonable jury could not conclude that she displayed deliberate indifference toward Scott-Manna. For one, Dr. Torry's opinion does not pertain to MHP Clarke's treatment and thus, there is no dispute of fact in the record as to whether her specific conduct fell so far below the minimally adequate standard of care to reflect a lack of professional judgment. Without this opinion, MPH Clarke's actions reflect a mid-level provider treating a complex mental health patient, not deliberate indifference. Relatedly, as Dr. Sims's and other higher-level psychologists' subordinate, MHP Clarke "can, and indeed must, defer to a treating physician's instructions." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). Here, the record shows that MHP Clarke repeatedly consulted with Dr. Sims and the other psychologists to discuss Scott-Manna's treatment plan and receive further instruction and feedback on how to proceed. *See, e.g.*, dkt. 261-3 ¶¶ 3, 10, 15–16. Furthermore, the Plan, which guided both custodial and medical staff's treatment of Scott-Manna was ultimately amended and approved by Dr. Sims, Dr. Keris, and two other higher-level providers who Scott-Manna does not sue. *See* dkt. 265-7 at 116:5-23. Although subordinate

healthcare providers cannot blindly or unthinkingly defer to the treating physicians' instructions, *see Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010), Scott-Manna has not designated evidence from which a jury could conclude that MHP Clarke blindly deferred to Dr. Sims and other providers.

For example, in *Berry* the Seventh Circuit reversed summary judgment for a nurse because the jury could find that her deference to the prison's physician, a general practitioner, was not justifiable given that the plaintiff complained about intense dental pain. *Id.* Furthermore, the passage of time between the physician's treatment of the plaintiff allowed a jury to infer that the nurse had exercised independent judgment. *Id.* Here, MHP Clarke seemingly followed a mental health treatment plan approved by an expert in mental health and continuously discussed Scott-Manna's treatment with that expert.

The Court grants summary judgment for MHP Clarke.

**3. Dr. Keris**

A reasonable jury could not infer that Dr. Keris's treatment of Scott-Manna displayed deliberate indifference toward Scott-Manna. First, like MHP Clarke, Dr. Torry's expert opinion does not address whether her specific conduct fell substantially below the minimally adequate standard of care and so does not create a dispute. Second, as Centurion points out, she was not personally involved in the creation or implementation of the Behavior Modification Plan. Individual liability under § 1983 "does not attach unless the individual defendant caused or participated in the constitutional violation." *Vance v. Peters*, 97 F.3d

987, 991 (7th Cir. 1996); *see Whitfield*, 76 F.4th at 706. "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Here, although Dr. Keris directly treated Scott-Manna a handful of times at New Castle, she was not personally involved in diagnosing his condition or in creating and implementing the Plan. Although she was one of the psychologists who eventually approved the Plan, Scott-Manna has not designated evidence that she reviewed the Plan, had any input in its contents, or was engaged in carrying out the tenets of the Plan.

Scott-Manna's claim that Dr. Keris's displayed deliberate indifference when she filled out the Mental Health Request Form for Scott-Manna's transfer to DWARSH in 2023 also fails as a matter of law. Although there is conflicting expert testimony about whether Scott-Manna's reports of psychosis should be regarded as genuine or malingering, the designated evidence does not support an inference that Dr. Keris knowingly disregarded Scott-Manna's diagnosis or indications that he would decompensate in segregated housing. For one, in 2023, a mental healthcare provider had not officially designated Scott-Manna as SMI—the medical record from 2015 stated that he met the criteria, but did not officially change his designation. *See* dkt. 266-1 at 3. The following year, a mental healthcare provider explicitly stated that Scott-Manna did not meet the SMI criteria, and this was reiterated year after year until November 2025—roughly two and a half years after Dr. Keris filled out the Mental Health Request Form.

*See* dkt. 266-5 at 5. Though Dr. Keris could have inferred from the medical records that Scott-Manna had legitimate auditory and visual hallucinations that should have classified him as "psychotic," and thus, SMI per the IDOC's definition, Scott-Manna has not designated evidence showing that her failure to make this inference departed so substantially from the acceptable standard of care as to reflect a lack of professional judgment. Indeed, the vast majority of Scott-Manna's mental healthcare providers determined that Scott-Manna did not display psychosis in part because he did not seem to respond to internal stimuli and his thoughts were linear and coherent.

The Court grants summary judgment for Dr. Keris.

**B. Eighth Amendment Deliberate Indifference Claims Against Centurion**

Private corporations acting under color of state law, such as Centurion, are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To survive summary judgment, the record must allow a reasonable jury to conclude that Centurion, "either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022) (citation omitted). Centurion cannot be held liable under a theory of respondeat superior. *Monell*, 436 U.S. at 691 ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in

other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.").

Here, Scott-Manna argues that Centurion's policy of "benign neglect" in his Behavior Modification Plan violates his Eighth Amendment rights. Dkt. 269 at 20. Seventh Circuit case law does contemplate *Monell* claims based on the plaintiff's individual experiences if the conduct is repetitive enough to where it is obvious that the treatment is the result of a widespread policy or practice. *See Hildreth v. Butler*, 960 F.3d 420, 426–28 (7th Cir. 2020) ("While it is not 'impossible' for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, 'it is necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'") (quoting *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)). Centurion argues, however, that the Plan is an individualized treatment plan for Scott-Manna and not an express or implied policy attributable to Centurion as an entity. *See* dkt. 276 at 12.

Scott-Manna has not designated evidence that "benign neglect" reflects a Centurion policy or practice that transcended his individual treatment plan or otherwise stems from a Centurion policy or practice. Despite the continuous nature of the Plan, the testimony and medical records show that Centurion employees, who did not have policy-making authority, developed the Plan to address Scott-Manna's specific behavioral issues. As the Centurion Defendants point out, Scott-Manna's response brief assumes that because MHP Clarke, Dr.

Sims, and Dr. Keris had a hand in either developing or approving the Plan, it is necessarily a Centurion policy. *See* dkt. 269 at 13–14. Scott-Manna does not cite *Monell* or engage with any of the criteria for showing that the Plan is an official policy or part of Centurion's widespread practice. Although Dr. Keris, a high-level Centurion official at the time the Plan was implemented, and ultimately participated in the approval of the Plan in some respect, Scott-Manna does not argue or provide evidence that her approval satisfies the criteria for showing that the Plan was "caused or ratified by a person with final policymaking authority." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *see id.* at 630 (explaining the criteria for ratification). Even then, Dr. Keris's participation in the approval process would only be meaningful for *Monell* purposes if the Plan could be characterized as a policy or widespread practice, which the designated evidence does not support.

Without more, Centurion's employees' actions are insufficient to establish *Monell* liability because Centurion cannot be held vicariously liable for their actions. *Monell*, 436 U.S. at 691. In this way, Scott-Manna has not met his burden of showing that *Centurion's* actions violated the Constitution, and the Court grants summary judgment for Centurion.

### C. Eighth Amendment Deliberate Indifference to Medical Needs for Injunctive and Declaratory Relief

As seen above, the threshold requirement for permanent injunctive relief is success on the merits of the underlying claim. *Lacy*, 897 F.3d at 867. The Court granted summary judgment to MHP Clarke, Dr. Keris, and Centurion on

Scott-Manna's Eighth Amendment medical deliberate indifference claims. Therefore, the only remaining claim that could warrant injunctive or declaratory relief is Scott-Manna's official capacity claim against Dr. Sims. *See Knowlton v. City of Wauwatosa*, 119 F.4th 507, 519 (7th Cir. 2024) ("In an individual capacity suit, a plaintiff may only seek monetary damages; in an official capacity suit, a plaintiff may only seek injunctive or declaratory relief."),

The Centurion Defendants argue that the official capacity claim against Dr. Sims cannot proceed because it is legally redundant of Scott-Manna's claim against Centurion. *See* dkt. 262 at 55–56. This is because Section 1983 lawsuits against local government officials in their official capacity operate as lawsuits against the government entity. *See Monell*, 436 U.S. 691 n.55 ("[O]ur holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name."); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The Court agrees.

Since private contractors acting under color of state law are treated as municipalities for Section 1983 purposes, the same rule would apply to claims against medical providers in prisons, such as Dr. Sims. *See Thomas v. Pfister*,

556 F. Supp. 3d 867, 873 (N.D. Ill. 2021) (discussing requirements for official capacity claims against medical providers in prisons).

Because Scott-Manna has not shown that Dr. Sims had final policy-making authority, *see Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1985), or that her employer, Centurion, caused the constitutional violations at issue under the *Monell* criteria, his claims for injunctive and declaratory relief against Dr. Sims in her official capacity may not proceed. Accordingly, the Court grants summary judgment to the Centurion Defendants on Scott-Manna's Eighth Amendment claim for injunctive and declaratory relief.

## V. CONCLUSION

The IDOC Defendants' motion for summary judgment, dkt. [251], is **GRANTED**. The Centurion Defendants' motion for summary judgment, dkt. [261], is **DENIED** as to the individual capacity Eighth Amendment claim against Dr. Sims. It is **GRANTED** in all other respects.

The **clerk is directed** to terminate MHP Clarke, Dr. Keris, Hendricks, James Basinger, Centurion, Commissioner of the IDOC, and Warden Vinardi[9] as defendants on the docket.

The Magistrate Judge is requested to hold a telephonic status conference with the remaining parties to discuss preparations for settlement and trial.

**SO ORDERED.**

Date: 11/18/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

---

[9] Warden Vinardi was not a named defendant in this matter. Warden Vinardi was served in his official capacity for the limited purpose of allowing Scott-Manna to identify correctional officers who allegedly committed excessive force. *See* dkt. 181 at 5–6.

Distribution:

AHKEEM SHAKUR SCOTT-MANNA
201208
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All ECF-registered attorneys of record

Magistrate Judge Mark Dinsmore